**UNITED STATES of America, Appellee,**

v.

**Isaias PAREDES–BATISTA, aka Carmelo Quiñones, Defendant–Appellant.**

**Docket 97–1110.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 9, 1997.

Decided March 18, 1998.

Elan Gerstmann, New York City (Edward S. Panzer, New York City, of counsel), for Defendant–Appellant.

Victor Osaii Olds, Assistant United States Attorney, Southern District of New York (Mary Jo White, United States Attorney, Guy Petrillo, Assistant United States Attorney, Southern District of New York, of counsel), for Appellee.

Before: KEARSE and CABRANES, Circuit Judges, and CHIN, District Judge.*

JOSÉ A. CABRANES, Circuit Judge:

Isaias Paredes–Batista ("Batista"),** also known as Carmelo Quiñones, appeals from his conviction and sentence, following a bench trial in the United States District Court for the Southern District of New York (Robert J. Ward, *Judge*), for one count of illegally reentering the United States after having been arrested and deported, in violation of 8 U.S.C. § 1326.[1] He challenges that conviction on three grounds. First, Batista contends that the district court (Miriam Goldman Cedarbaum, *Judge*) erred in denying his pre-trial motion to dismiss the indictment, in which he alleged the deprivation of his right to a speedy trial under the Interstate Agreement on Detainers ("IAD"), 18 U.S.C.App. § 2, the Speedy Trial Act of 1974,

---

\* The Honorable Denny Chin, of the United States District Court for the Southern District of New York, sitting by designation.

\*\* The matronymic "Batista" is used here for convenience only, because it has been used in prior proceedings and documentation.

1. Prior to amendments not effective against Batista, 8 U.S.C. § 1326 provided, in pertinent part:

    § 1326. Reentry of deported alien; criminal penalties for reentry of certain deported aliens

    (a) Subject to subsection (b) of this section, any alien who—

    (1) has been arrested and deported ... and thereafter

    (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior

    to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission ... shall be fined under Title 18, or imprisoned not more than 2 years, or both.

    (b) Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection—

    ....

    (2) whose deportation was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such Title, imprisoned not more than 15 years, or both.

18 U.S.C. §§ 3161 *et seq.*, and Fed.R.Crim.P. 48(b). Second, Batista challenges the judgment of conviction entered by Judge Ward, arguing that he could not properly have been convicted of illegal reentry when the deportation proceeding underlying that offense was not, he alleges, consistent with due process. Third, with respect to the eighty-four month sentence he received, Batista argues that Judge Ward should have granted him a three-point offense level reduction for acceptance of responsibility, under U.S.S.G. § 3E1.1, notwithstanding his having proceeded to trial.

Although we find the government's procedures for processing speedy trial requests disturbing and (for reasons stated below) worthy of revision by pertinent authorities of the executive branch of government, we are constrained to agree with the district court that Batista could not secure a dismissal based on the administrative lapses that hindered his attempt to obtain a prompt adjudication. In addition, we find Batista's collateral attack on his deportation hearing to be unavailing, and uphold the district court's refusal to award an acceptance of responsibility reduction of Batista's Sentencing Guidelines offense level. Accordingly, we affirm the district court's judgment of conviction and sentence.

## I.

The facts regarding Batista's sojourns in the United States are generally uncontested.

Batista is a citizen of the Dominican Republic who entered the United States as a lawful permanent resident alien in 1987. In 1989, he was arrested for the criminal sale of cocaine in violation of N.Y. Penal Law § 220.31.[2] He pleaded guilty and began serving a two- to four-year term of imprisonment. That conviction constituted a "drug trafficking crime" sufficient to classify Batista as an "aggravated felon" under the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1101(a)(43),[3] and rendered him subject to deportation under 8 U.S.C. § 1251(a)(4)[4] and 8 U.S.C. § 1251(a)(11).[5]

While incarcerated in a New York state prison, Batista participated in a deportation hearing by telephone in June 1990. He was represented by counsel by telephone during that hearing, although he contends that he never saw or previously conversed with the attorney. At the conclusion of that hearing, the immigration judge ("IJ") found Batista to be deportable. Batista acknowledged in his testimony at the 1996 bench trial before Judge Ward that the IJ in 1990 had informed him of his right to appeal the deportation determination, and that he had chosen not to do so; the transcript of the deportation hearing indicates that the IJ asked Batista three times whether he wished to appeal, to which Batista finally replied, "No. No." Batista offered to pay for his own ticket back to the Dominican Republic, and was told to take the matter up with his lawyer after the hearing.

2. N.Y. Penal Law § 220.31 (McKinney 1989) provides that "[a] person is guilty of criminal sale of a controlled substance in the fifth degree when he knowingly and unlawfully sells a controlled substance."

3. 8 U.S.C. § 1101(a)(43) then provided, in pertinent part:

(43) The term "aggravated felony" means ... any drug trafficking crime as defined in section 924(c)(2) of Title 18 ... committed within the United States.

In turn, 18 U.S.C. § 924(c)(2) defines a "drug trafficking crime" as any felony punishable under, *inter alia*, the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, which includes the knowing or intentional "manufacture, distribut[ion], or dispens[ation]" of a controlled substance, 21 U.S.C. § 841(a)(1). Cocaine is a controlled substance, *see* 21 U.S.C. § 802(6); 21 U.S.C. § 812 (Schedule II(a)(4)). *See* notes 4 & 5, *infra*.

4. 8 U.S.C. § 1251(a)(4) then provided, in pertinent part:

Any alien in the United States ... shall, upon the order of the Attorney General, be deported who ... is convicted of an aggravated felony at any time after entry.

This section has since been revised and recodified at 8 U.S.C. § 1227(a)(2)(A)(iii).

5. 8 U.S.C. § 1251(a)(11) then provided, in pertinent part:

Any alien in the United States ... shall, upon the order of the Attorney General, be deported who ... at any time has been convicted of a violation of ... *any law or regulation of a State,* the United States, or a foreign country relating to a controlled substance (as defined in [21 U.S.C. § 802]).

(emphasis supplied). This section has since been revised and recodified at 8 U.S.C. § 1227(a)(2)(B)(i).

Batista was deported on June 19, 1990. He admitted at trial in 1996 to returning to the United States in the spring of 1991. He had not sought or received permission from the Attorney General to do so. On January 8, 1992, Batista, then using the name Carmelo Quiñones, was arrested in New York on narcotics charges, to which he pleaded guilty on January 5, 1993 and received a two and a half to five-year sentence.

While Batista was serving that sentence at the Ulster Correctional Facility in Ulster, New York, a federal grand jury returned a one-count indictment charging him with illegally reentering the United States in violation of 8 U.S.C. § 1326.[6] Batista escaped from a work-release program in December 1993 and spent six months as a fugitive before being recaptured in late May 1994. On July 15, 1994, a detainer relating to the federal indictment was served on New York state prison officials, who in turn served a copy on Batista on July 21, 1994.

The detainer notice advised Batista of his right to demand a speedy trial on the federal charge. On an unknown date around July 21, 1994, Batista made that demand in writing on the detainer form, by signing his alias (Carmelo Quiñones) to a preprinted paragraph that included the following language: "I [do] demand a speedy trial on these charges. I understand that if I do request a speedy trial, this request will be delivered to the Office of the United States Attorney who caused the Detainer to be filed." The detainer form, USM–17, requests the state prison officials to return the executed form to the issuing U.S. Marshals' office. Batista's speedy trial request was faxed from the U.S. Marshals' office for the Western District of New York to the U.S. Marshals' office for the Southern District on September 14, 1994. At this point, however, the processing system failed: neither the U.S. Attorney's Office nor the U.S. District Court for the Southern District of New York appears to have received the request.

Upon his March 6, 1995 release from New York custody, Batista was arrested on the detainer and taken into federal custody. At a pre-trial conference before Judge Cedarbaum on April 21, 1995, Batista, then represented by assigned counsel, produced a copy of his July 1994 speedy trial request; the Assistant U.S. Attorney assigned to the case represented that he first became aware of the request's existence at that conference. On June 9, 1995, Batista moved to dismiss the indictment on the ground that he had been denied his right to a speedy trial. Judge Cedarbaum denied the motion on October 2, 1995, citing, *inter alia*, Supreme Court precedent holding that speedy trial deadlines under the Interstate Agreement on Detainers are triggered only upon the prosecutor's and court's actual receipt of a speedy trial request. Judge Cedarbaum did, however, expressly direct the U.S. Attorney's Office to work with the U.S. Marshals to change form USM–17 so as to accurately inform prisoners that their speedy trial rights under the IAD would only become effective upon both the U.S. Attorney's and district court's actual receipt of the prisoners' requests.

Batista negotiated a plea agreement that would have preserved the speedy trial issue for appeal, but then changed his mind and, on the day that he was to enter the plea, informed the court that he wished to go to trial. Batista declined the government's request to stipulate prior to trial that he was an alien at the time of his 1990 deportation and that he had been found in the United States after having been deported. By consent of the parties, the case was tried without a jury before Judge Ward on May 6 and 7, 1996. At the trial's conclusion, the court entered findings of fact and conclusions of law resulting in Batista's conviction for illegally reentering the United States in violation of 8 U.S.C. § 1326. In the course of rendering his decision, Judge Ward stated that the "deportation hearing conducted by telephone comported with the basic requirements of due process."

Judge Ward sentenced Batista to an eighty-four month prison term, based on an

---

6. Batista was ultimately tried and convicted under a superseding indictment filed February 28, 1996, which also contained a single count charging him with violating 8 U.S.C. § 1326. *See* note 1, *supra*.

offense level under the U.S. Sentencing Guidelines of twenty-three, which included a one-point reduction as a result of Batista's promise to leave the country when asked to do so. Judge Ward rejected Batista's argument that he was entitled to a three-point offense level reduction for acceptance of responsibility. In doing so, the judge stated that, while insisting on a trial solely to preserve legal issues for appeal would not bar such a reduction, Batista's primary defense— that his 1990 deportation was illegal—had effectively contested his guilt with respect to an element of the offense.[7]

## II.

Batista first challenges the district court's October 1995 ruling denying his motion to dismiss the indictment on speedy trial grounds. He argues that the district court erred in not dismissing the indictment under the IAD, the Speedy Trial Act, or Federal Rule of Criminal Procedure 48.[8] We believe the U.S. Marshals' current procedures with respect to detainer speedy trial requests are flawed, and we urge prompt action by the executive branch of government to improve them. However, we are obliged to conclude, in this case at least, that under applicable law these administrative failings did not entitle Batista to a dismissal of the charge against him.

### A. The Interstate Agreement on Detainers

A detainer is a notice filed with an institution in which a particular prisoner is incarcerated, advising that he is wanted to face pending criminal charges in another jurisdiction, and requesting that the prisoner either be held for the other jurisdiction's

prosecutors or that these prosecutors be notified when the prisoner's release is imminent. *See Carchman v. Nash,* 473 U.S. 716, 719, 105 S.Ct. 3401, 3403, 87 L.Ed.2d 516 (1985); *Cuyler v. Adams,* 449 U.S. 433, 436 n. 3, 101 S.Ct. 703, 706 n. 3, 66 L.Ed.2d 641 (1981) (citing legislative history of the IAD). The IAD is a congressionally sanctioned interstate compact[9] that is meant to "encourage the expeditious and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." IAD art. I, 18 U.S.C.App. § 2. New York and the United States are both parties to the IAD. *See* N.Y.Crim. Proc. Law § 580.20 (McKinney 1995); 18 U.S.C.App. § 2.

Under the IAD, whenever a detainer is lodged by one party's criminal justice agency against a prisoner held by another party, "he shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of ... his request for a final disposition to be made of the indictment." IAD, art. III(a), 18 U.S.C.App. § 2. The 180–day time limit may be tolled by virtue of delays attributable to the prisoner, *see United States v. Roy,* 771 F.2d 54, 59 (2d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1520, 89 L.Ed.2d 918 (1986), or by a continuance granted by the court "for good cause," IAD, art. III(a), 18 U.S.C.App. § 2. In Batista's case, however, the question is not whether the 180–day time limit was properly extended, but when that time limit began to run.

---

7. Batista also sought a downward departure based on the totality of the circumstances leading to his conviction, including the alleged deprivation of his right to a speedy trial, the eight months spent in state prison that he might have been able to serve concurrently with his federal sentence had he received a speedy trial, his willingness to undergo drug rehabilitation, and emotional and psychological pain that he allegedly suffered as a youth. The court rejected this argument, and Batista does not press it on appeal.

8. Batista did not assert a claim under the Speedy Trial Clause of the Sixth Amendment, U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ...."), and does not press one on appeal.

9. As such, the IAD comes within the Compact Clause of the U.S. Constitution, art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State ...."), and is thus a federal law subject to federal interpretation. *See Carchman,* 473 U.S. at 719, 105 S.Ct. at 3403.

Batista requested a speedy trial on or about July 21, 1994.[10] Almost a year later, on June 9, 1995, Batista filed a motion to dismiss the indictment because, *inter alia*, the government had failed to try him within 180 days after notice of his speedy trial request. Batista had followed the procedure set out by the U.S. Marshals' office in the USM–17 form by signing the speedy trial request and returning the form to prison officials, who in turn followed USM–17's directions to return the executed form (in an enclosed, self-addressed envelope) to the U.S. Marshals' office. Under its regular practice, the U.S. Marshals' office in the Southern District, having received the USM–17 form from the Western District on September 14, 1994, should have promptly forwarded it to the U.S. Attorney's office and to the district court. In this case, however, that system failed. For reasons not explained in this record, Batista's speedy trial request apparently did not come to the attention of either the U.S. Attorney or the court until seven months after the pertinent documents were faxed to the U.S. Marshals' office in the Southern District—namely, at the pre-trial conference before Judge Cedarbaum on April 21, 1995.

Not only did the government mishandle Batista's speedy trial request, but it arguably misled him as to the requirements for invoking his speedy trial rights. Nowhere did the USM–17 form specify that Batista's speedy trial rights would hinge on whether he "caused [the request] to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction." IAD, art. III(a), 18 U.S.C.App. § 2. In fact, the form itself only stated that the request would be forwarded to the appropriate U.S. Attorney's office, making no mention of any filing with the appropriate district court. While Batista, incarcerated in state prison, would not have been in a position to personally ensure delivery to either institution, informing him of these prerequisites would at least have permitted him to monitor and police his speedy trial rights.

Judge Cedarbaum quite properly expressed concerns on this score, and on October 2, 1995 she explicitly directed the government to work with the U.S. Marshals' office to change the USM–17 form "to advise the prisoner of the steps that must be taken to make his request effective beyond signing the form." More than two years later, having apparently ignored Judge Cedarbaum's 1995 instructions, the U.S. Attorney's office could tell this Court only that it is now "pursuing this matter with the Office of the Associate Counsel of the United States Marshals in Washington." Furthermore, the U.S. Attorney's office advised us that it is "unable to assure the Court that [the] dialogue will ultimately result in any change" to USM–17, which has been in use nationwide for more than twenty years.

While we are not blind to the difficulties inherent in modifying administrative routines, federal prosecutors and the U.S. Marshals Service should not close their eyes to the pitfalls of continuing to rely on flawed procedures and paperwork. As discussed below, we have no reason to question Judge Cedarbaum's conclusion in this case that there was no evidence of bad faith or affirmative misconduct that would warrant estopping the U.S. Attorney's office from claiming that it had not received Batista's request. But administrative inertia does not license the government to obscure the rights of prisoners without consequences. Having now been afforded ample opportunity to review and to correct these identified shortcomings in the USM–17 form, it is entirely conceivable that in the future a court might have grounds to conclude that the government's continued use of paperwork that on its face fails to properly advise prisoners of how to give effect to their speedy trial requests is evidence of a lack of good faith that might give rise to estoppel. *Cf. City of New York v. Shalala*, 34 F.3d 1161, 1168 (2d Cir.1994).

**10.** Batista's signature following the speedy trial request section of the USM–17 detainer notice form is not dated. However, the Inmate Record Coordinator's signature on the same page, indicating that the detainer notice was read to Batista and that copies were delivered to him, is dated July 21, 1994. In any event, this date is not dispositive in light of our holding below that the 180-day limit was triggered only upon the court's actual receipt of the request.

The district court's legal conclusions under the IAD and the Speedy Trial Act (discussed below) are subject to *de novo* review. *See United States v. Simmons*, 786 F.2d 479, 483 (2d Cir.1986); *United States v. Collins*, 90 F.3d 1420, 1425 (9th Cir.1996). Batista argues that, having fully complied with the speedy trial request instructions he was given, and not having been brought to trial within 180 days, he was entitled to a dismissal of the indictment against him. While we recognize the conundrum faced by any defendant in such circumstances, and we are troubled by the government's procedures for handling speedy trial requests and its lethargic responses to inquiries by the courts regarding the use of arguably misleading documents, we agree with the district court's reading of the IAD and thus find no error in its denial of Batista's motion to dismiss the indictment.

The plain language of the IAD provides that a prisoner who is the subject of a detainer must be tried within 180 days after he causes his speedy trial request to be delivered to the court and the prosecutor whose office filed the detainer. The Supreme Court has stated unequivocally that the IAD is to be read literally: "[T]he 180-day time period in Article III(a) of the IAD does not commence until the prisoner's request for final disposition of the charges against him *has actually been delivered* to the court and the prosecuting officer of the jurisdiction that lodged the detainer against him." *Fex v. Michigan*, 507 U.S. 43, 52, 113 S.Ct. 1085, 1091, 122 L.Ed.2d 406 (1993) (emphasis supplied).

In *Fex*, a prisoner in Indiana was tried in Michigan 196 days after he delivered his speedy trial request to Indiana prison authorities, but only 177 days after the Michigan prosecutor received the request. *Id.* at 46, 113 S.Ct. at 1088. In arriving at its holding that actual receipt starts the statutory 180-day clock, the Supreme Court considered not only the text of the IAD, but also "fairness" arguments very much like the ones that Batista raises here. The Court anticipated "worst-case scenarios" under the competing interpretations of the IAD, weighing the consequences to the prisoner and the prosecutor if a speedy trial request never reached the prosecutor. It expressly concluded that the harm to a prisoner of spending extra time during his incarceration in one jurisdiction under detainer from another jurisdiction due to mishandling of his request was less worrisome than the harm caused if a prosecutor, never having received notice of the request, lost the ability to prosecute a case altogether. *Id.* at 50–51, 113 S.Ct. at 1090–91. To avoid this latter, "worse" outcome, as well as to comport with its reading of the text of the IAD, the Court conditioned the start of the 180-day clock on actual receipt of the request by the court and prosecutor of the jurisdiction filing the detainer. The Court also rejected arguments that this rule was unfair to prisoners who "ha[ve] little ability to enforce compliance" with IAD delivery requirements, and thus would be at the mercy of administrative delays and mishaps in their efforts to obtain a speedy trial. Such "fairness" arguments, the Court concluded, "are ... more appropriately addressed to the legislatures of the contracting States, which adopted the IAD's text." *Id.* at 52, 113 S.Ct. at 1091.

The explicit holding in *Fex* governs this case. While under the IAD the U.S. Attorney was required to bring Batista to trial within 180 days, that 180-day clock did not begin to run until Batista's demand for a speedy trial was "actually ... delivered to the [district] court and prosecuting officer." *Id.* That "delivery" apparently did not occur until April 21, 1995, when Batista's attorney produced a copy of the speedy trial request at the pre-trial status conference before Judge Cedarbaum. Even if we were to accept *arguendo* that delivery of the request to the U.S. Marshals' office in the Southern District of New York in September 1994 was sufficient under a theory of agency to constitute delivery to the "prosecuting officer" (the U.S. Attorney for the Southern District), as Batista urges, that request did not become effective and start the 180-day clock until it was *also* delivered to the district court—an event that did not occur until April 21, 1995. *See United States v. Collins*, 90 F.3d 1420, 1426 (9th Cir.1996) (holding that delivery of IAD speedy trial request to U.S. Marshals did not constitute delivery to district court

"because the Marshals are not agents for the court for purposes of accepting every request they find thrust upon them").

█ The Supreme Court has made clear that this actual delivery rule is not to be trumped by "fairness" arguments like that advanced by Batista. *Fex*, 507 U.S. at 51–52, 113 S.Ct. at 1090–91. Similarly, we are not persuaded by Batista's argument that the government, because it created the procedure and the allegedly flawed USM–17 form for processing IAD speedy trial requests, should be equitably estopped from disclaiming timely receipt of Batista's request. First, we note that even if the government were so estopped, the district judge would not be in any way precluded from taking judicial notice that the *court* did not receive a copy of Batista's speedy trial request, as required by the IAD—and hence, that the 180–day limit was not triggered—until April 21, 1995. Second, "[w]e apply estoppel to the Government only in those limited cases where the party can establish both that the Government made a misrepresentation upon which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct," *Shalala*, 34 F.3d at 1168, and the Supreme Court has rarely, if ever, upheld a finding of estoppel against the United States, *see Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 426–27, 110 S.Ct. 2465, 2472–73, 110 L.Ed.2d 387 (1990). While it is debatable whether the language of USM–17 may be characterized as a misrepresentation, there is no indication of affirmative government misconduct—either in creating the IAD processing system or in handling Batista's USM–17 form in particular. *But cf.* discussion *supra* at page 373. Batista, represented by able counsel, produced no evidence to suggest that the Department of Justice uses the U.S. Marshals as a conduit deliberately to circumvent the IAD's time limits, or that Batista fell victim to anything other than an unfortunate, and at worst negligent, paperwork blunder. Thus the district court's finding that there was "no evidence here of affirmative or deliberate misconduct" by the government in this case was not clearly erroneous, and equitable estoppel was properly rejected.

For the foregoing reasons, we hold that the district court correctly applied *Fex* when it refused to dismiss the indictment against Batista under the IAD where his speedy trial request was not actually delivered to both the United States District Court and the U.S. Attorney for the Southern District until April 21, 1995. While we agree with Batista that form USM–17 is seriously flawed, and ought to be modified so that prisoners are fully informed of the steps necessary to make their IAD speedy trial requests effective, *Fex* requires that, in the circumstances here presented, he be held to those explicit IAD requirements.

## B. The Speedy Trial Act (18 U.S.C. § 3161 et seq.)

█ Batista also contends, in the alternative, that he was entitled to dismissal of the indictment pursuant to the Speedy Trial Act, which directs that the government "shall promptly . . . cause a detainer to be filed with the person having custody of the prisoner and request him . . . to advise the prisoner of his right to demand trial." 18 U.S.C. § 3161(j)(1). Judge Cedarbaum refused to dismiss the indictment on this ground because "[e]very court that has considered th[e] question has held that dismissal is not an available remedy for a violation of that provision." We joined the ranks of courts so holding in an opinion handed down after oral argument in this appeal, *United States v. Lainez–Leiva*, 129 F.3d 89 (2d Cir.1997) (per curiam), where we too concluded that "while Congress authorized dismissal as a sanction for some Speedy Trial Act violations, § 3161(j) violations are not among them." *Id.* at 91.

## C. Federal Rule of Criminal Procedure 48(b)

█ Batista's final argument based on the government's delay in bringing him to trial centers on the district court's alleged failure to appreciate or exercise its inherent discretion to dismiss the indictment, notwithstanding the unavailability of that remedy under the IAD or the Speedy Trial Act. Federal Rule of Criminal Procedure 48(b) provides that "[i]f there is unnecessary delay . . . in

bringing a defendant to trial, the court may dismiss the indictment, information or complaint." Batista argues that Rule 48(b), which the Advisory Committee Notes describe as "a restatement of the inherent power of the court to dismiss a case for want of prosecution," constitutes an independent ground on which the district court could have dismissed the indictment against him, and he alleges error in the district court's failure to address this separate basis for dismissal.

While it is true that Judge Cedarbaum did not specifically mention Rule 48(b) in her ruling denying Batista's motion to dismiss, we note that Batista's own submissions to the district court only urged dismissal pursuant to Rule 48(b) as "a remedy when 18 U.S.C. § 3161(j) is violated." Mem. of Law in Supp. of Def.'s Motion to Dismiss at 9. Having correctly found that dismissal is not an available remedy for a violation of § 3161(j), *see Lainez–Leiva,* 129 F.3d at 91, the district court's omission of any separate discussion of Rule 48(b) is unsurprising. Because Batista did not bring this argument—that Rule 48(b) constitutes a separate basis for a dismissal even if that outcome is not required by the IAD or the Speedy Trial Act—to the attention of the district court, either in his papers or at the hearing on his motion on July 14, 1995, he failed to invoke the district court's discretion and cannot complain of the court's failure to exercise it. *See United States v. DiFrancesco,* 604 F.2d 769, 776 (2d Cir.1979), *rev'd on other grounds,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *United States v. New Buffalo Amusement Corp.,* 600 F.2d 368, 376 n. 13 (2d Cir.1979). In any event, that the district court did not resort to its discretionary powers to dismiss the complaint for undue delay in prosecution was entirely in keeping with proper "caution in exercising this extraordinary power where laws and rules specifically designed to prevent pretrial delay [such as the IAD and the Speedy Trial Act] do not require dismissal." *See United States v. Simmons,* 812 F.2d 818, 820 (2d Cir.1987). Accordingly, we find no error in the district court's failure to address Rule 48(b) as a separate basis for dismissal.

### III.

Batista's second challenge is to the deportation hearing underlying his conviction, which he alleges did not comport with due process. If that deportation hearing was defective, Batista reasons, it cannot properly be the basis for his conviction for the offense of reentering the United States after "ha[ving] been arrested and deported," 8 U.S.C. § 1326.

Section 1326 does not, on its face, require that the earlier deportation have been "lawful" to support a conviction for illegal reentry. *See* 8 U.S.C. § 1326; *see also United States v. Mendoza–Lopez,* 481 U.S. 828, 834–35 & n. 9, 107 S.Ct. 2148, 2153 & n. 9, 95 L.Ed.2d 772 (1987). The Supreme Court has held, however, that due process dictates that a disposition in a deportation hearing may not be used "to establish conclusively an element of a criminal offense" unless it is, at some point, subject to judicial review. *Id.* at 838, 107 S.Ct. at 2155. Accordingly, if defects in a deportation proceeding "effectively eliminate[ ] the right of the alien to obtain [direct] judicial review," that deportation proceeding may be attacked collaterally in any subsequent proceeding that uses the deportation to establish an element of a criminal offense—such as a trial under 8 U.S.C. § 1326. *Id.* at 838–39, 107 S.Ct. at 2155–56. It is this sort of collateral attack that Batista wishes to mount. We conclude, however, that he is precluded from doing so.

To be permitted to attack his deportation collaterally, Batista must first demonstrate that defects in the deportation proceedings effectively deprived him of his right to direct appeal of the IJ's decision. *See id.; United States v. Fares,* 978 F.2d 52, 56 (2d Cir.1992). However, Batista did have a right to a direct appeal, he was informed of that right, and he expressly declined to exercise it. He thus faces a difficult task in attempting to claim that he was somehow deprived of his right to appeal from the IJ's deportation determination.

The core of Batista's argument appears to be that his express waiver of the right to appeal was not "considered and intelligent," *Fares,* 978 F.2d at 56, because he was "entirely without advice" in the proceeding, and

because whatever assistance he did receive from his counsel was ineffective. Because deportation is a civil, not criminal, proceeding, *see Saleh v. United States Dep't of Justice*, 962 F.2d 234, 241 (2d Cir.1992), Batista was not guaranteed the assistance of counsel (although he was entitled to be represented at his own expense if he so chose). *See Montilla v. INS*, 926 F.2d 162, 166 (2d Cir. 1991); 8 U.S.C. § 1252(b)(2) (1982) [11]. We note that Batista was represented by counsel throughout the deportation hearing, and that his attorney evidenced familiarity with Batista's case. However taciturn he may have been at the moment waiver was sought, Batista's counsel was on hand and ready and able to safeguard his client's rights. Additionally, there is no indication that Batista was prevented during the hearing from consulting with his attorney, or from asking questions of his own.

Batista also points to the fact that his deportation hearing was conducted not in person but by telephone; this, he contends, also worked to deprive him of his right to appeal. We have noted previously that telephone hearings are "always undesirable," *Kyei v. INS*, 65 F.3d 279, 283 n. 4 (2d Cir.1995), and one of the drawbacks of the procedure is highlighted by the transcript of Batista's deportation proceeding, which indicates that he may have had occasional difficulty hearing the IJ, his lawyer, and the interpreter. We have not, however, gone so far as to hold that in-person deportation hearings are required by statute or by the Constitution.

Batista urges us to follow the example of the Court of Appeals for the Ninth Circuit, which has required that deportation hearings be conducted in person (absent consent to a telephonic hearing). *See Purba v. INS*, 884 F.2d 516, 517–18 (9th Cir.1989). The Ninth Circuit reached that conclusion based on an interpretation of the statutory text then (but no longer) in effect: the Court interpreted 8 U.S.C. § 1252(b)'s [12] direction that deportation proceedings be held "before" an IJ to require hearings "in the presence of" that officer. *Id.* The Court of Appeals for the Eleventh Circuit, on the other hand, rejected the *Purba* reading of § 1252(b). *See Bigby v. INS*, 21 F.3d 1059, 1063–64 (11th Cir. 1994). That Court concluded that the term "before" could also have the meaning "judged or acted on by" without requiring the IJ's physical presence; in light of this ambiguity, and in the absence of clear congressional intent, the Eleventh Circuit deferred to the INS's "reasonable interpretation" of the statute and held that, when credibility determinations are not at issue, telephonic hearings are permissible. *Id.* We need not actually take sides in this disagreement [13] because the question before us is not whether the deportation proceeding was procedurally exemplary, but whether it was defective in a manner that effectively deprived Batista of his right to direct appeal. In response to that latter question, it does not seem to us that the *mode* of communication in the instant case— *i.e.*, that Batista was informed by telephone of his right to appeal, that he was asked by telephone whether he wished to appeal, that his lawyer by telephone offered no advice at

---

**11.** Substantially revised provisions regarding an alien's representation at deportation proceedings are now codified at 8 U.S.C. §§ 1229(b), 1229a(b)(4)(A).

**12.** The version of 8 U.S.C. § 1252(b) in effect at the time of the *Purba* decision, and applicable to Batista's 1990 deportation proceeding, provided in pertinent part that a "[d]etermination of deportability in any case shall be made only upon a record made in a proceeding before [an IJ], at which the alien shall have reasonable opportunity to be present, unless by reason of the alien's mental incompetency it is impracticable for him to be present, in which case the Attorney General shall prescribe necessary and proper safeguards for the rights and privileges of such alien."

**13.** The propriety of telephone proceedings should not long trouble the courts. In 1996, Congress substantially revised (and recodified) the immigration statutes, including the procedural specifications for deportation proceedings. Section 1229a of Title 8 now provides that "[t]he proceeding may take place (i) in person, (ii) where agreed by the parties, in the absence of the alien, (iii) through video conference, or (iv) ... through telephone conference," 8 U.S.C. § 1229a(b)(2)(A), with the limitation that in the circumstance of an "evidentiary hearing on the merits," the alien's consent to a proceeding by telephone must be obtained, 8 U.S.C. § 1229a(b)(2)(B). The revised statute thus strikes a middle ground between the *Purba* and *Bigby* holdings.

this point, and that Batista responded "No. No." by telephone—of itself establishes such a deprivation.

In the circumstances described, it does not appear to us that Batista was deprived of his right to a direct appeal. He was informed of his right to appeal, and he was represented by counsel (however taciturn) when he declined the opportunity to exercise that right. That that colloquy occurred by telephone does not alter the fact that it took place. Accordingly, we are not disposed to allow Batista to proceed with a collateral attack on that deportation proceeding.

Moreover, even if we were to conclude that, at the margin, the circumstances of Batista's deportation hearing might have worked to deny him his right of direct appeal, and we were to allow him to mount a collateral attack on the validity of that proceeding, Batista's challenge to his conviction would still fail. To *succeed* in a collateral attack, Batista would have to show that he was prejudiced by the deprivation of his right of direct appeal—that is, he would have to show that "a fully informed exercise of the right of direct appeal would have yielded [him] ... relief from deportation." *Fares*, 978 F.2d at 57; *see also United States v. Proa–Tovar*, 975 F.2d 592, 594–95 (9th Cir. 1992) (en banc); *United States v. Encarnacion–Galvez*, 964 F.2d 402, 406–08 (5th Cir. 1992); *United States v. Santos–Vanegas*, 878 F.2d 247, 251–52 (8th Cir.1989); *United States v. Holland*, 876 F.2d 1533, 1537 (11th Cir.1989).

On the merits of his deportability, Batista can make no such showing—he offers no grounds on which, had he appealed directly, he could have successfully contested the IJ's determination that he was deportable by rea-son of his New York state narcotics conviction.

A showing of prejudice may also be based on defects in the deportation proceeding itself—if they rendered the proceeding so "fundamentally unfair" in some respect that the alien would have been entitled to relief on direct appeal. *See Fares*, 978 F.2d at 57; *United States v. Torres–Sanchez*, 68 F.3d 227, 230 (8th Cir.1995); *Proa–Tovar*, 975 F.2d at 595. Had, for example, the assistance of Batista's counsel in fact been so ineffective that it "impinged upon the fundamental fairness of the hearing in violation of the [F]ifth [A]mendment due process clause," *Rabiu v. INS*, 41 F.3d 879, 882 (2d Cir.1994) (internal quotation marks omitted), Batista could claim to be prejudiced by the deprivation of his right to direct appeal, because such a due process violation would have been grounds for relief from his deportation order.

As specific evidence of his counsel's ineffectiveness, Batista contends that his attorney should have interpreted Batista's offer to pay for his own plane ticket as a request for "voluntary departure" under 8 U.S.C. § 1254(e) (1982),[14] and pressed the IJ for that option, which might have altered Batista's eligibility for later reentry. Such a request, however, would have been futile because Batista, having been convicted of a narcotics offense, was not *eligible* for voluntary departure. *See* 8 U.S.C. § 1254(e) (1982) (expressly excluding from voluntary departure aliens deportable under 8 U.S.C. § 1251(a)(4) (1982) by reason of a criminal conviction). As a result, Batista cannot show any prejudice resulting from the instance of alleged ineffectiveness he identifies,[15] and it is unlikely that "competent counsel" would have acted any differently than did his own. *Rabiu*, 41 F.3d at 882 (explaining showing

---

14. This provision has since been repealed. *See* Pub.L. No. 104–208, Div. C., Title III, § 308(b)(7), 110 Stat. 3009–615 (Sept. 30, 1996). Similar provisions regarding voluntary departure are now codified at 8 U.S.C. § 1229c(b).

15. In passing, Batista also notes that his attorney did not pursue discretionary relief from the Attorney General under 8 U.S.C. § 1182(c) (1982) (subsequently repealed, *see* Pub.L. No. 104–208, Div. C., Title III, § 304(b), 110 Stat. 3009–615 (Sept. 30, 1996)) or 8 U.S.C. § 1254(a) (1982)

(now substantially revised and recodified at 8 U.S.C. § 1229b(a)). Again, however, such efforts would have been in vain: § 1182(c) gave the Attorney General discretion to allow the re-entry of permanent resident aliens then outside the United States (which Batista was not), while § 1254(a) allowed for suspension of deportation in the Attorney General's discretion for certain persons of "good moral character" (which Batista's narcotics conviction would have defeated).

required to support ineffectiveness-of-counsel claim in deportation context). Accordingly, Batista's counsel was not ineffective, much less so ineffective as to have affected the fundamental fairness of the proceeding, and the other defects of the proceedings to which he points—his counsel's failure to offer advice, and the telephonic hearing—similarly do not rise to the level of fundamental unfairness in violation of his due process rights. We are persuaded that, had Batista exercised his right to direct appeal, contending that his counsel's performance and the telephonic nature of the deportation hearing rendered the proceeding "fundamentally unfair," the deportation order would have been upheld. *See Fares,* 978 F.2d at 58. In this respect, we agree with Judge Ward's finding that the deportation hearing "comported with the basic requirements of due process." Accordingly, we conclude that a collateral attack on Batista's 1990 deportation, were we to permit it, would not succeed.

Because Batista has not shown that defects in the deportation proceeding effectively deprived him of his right to appeal that determination directly, he is precluded from collaterally attacking the validity of the deportation in the current proceedings. Even if he were to be allowed to mount it, such a collateral attack could not succeed because Batista cannot show prejudice. Accordingly, the 1990 deportation order remains a valid basis for the present prosecution, and may be used as conclusive evidence of the deportation element of his 8 U.S.C. § 1326 offense.

## IV.

■ Batista's final challenge on appeal is to the sentence imposed upon him under the federal Sentencing Guidelines. He argues that the district court erred in denying him a

three-point offense level reduction for acceptance of responsibility pursuant to § 3E1.1 of the Guidelines.[16] Judge Ward sentenced Batista principally to eighty-four months' imprisonment. That sentence was based on a criminal history category of V and an offense level of 23, which reflected a one-level downward adjustment granted, over the government's objection, following Batista's promise to leave the United States voluntarily after serving his sentence. Judge Ward refused, however, to further adjust Batista's offense level pursuant to § 3E1.1.

Guidelines § 3E1.1 provides for a two- or three-level downward adjustment if the defendant demonstrates an acceptance of responsibility for his offense. We have observed that " '[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.' " *United States v. Castano,* 999 F.2d 615, 617 (2d Cir.1993) (quoting U.S.S.G. § 3E1.1, Application Note 2). That a defendant proceeds to trial does not, of itself, render him ineligible for the § 3E1.1 adjustment, but to obtain it he will have to persuade the district court that his is one of the "rare situations" in which "a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." U.S.S.G. § 3E1.1, Application Note 2. As Application Note 2 goes on to explain, such a situation

may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute

**16.** Section 3E1.1 of the Sentencing Guidelines provides:
(a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.
(b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:

(1) timely providing complete information to the government concerning his own involvement in the offense; or
(2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently,
decrease the offense level by 1 additional level.

or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

Batista asserts that his is one of these "rare situations," because he proceeded to trial predominantly on the issue of the validity of the underlying 1990 deportation proceeding, which he contends was a collateral legal issue, and not an issue of "factual guilt" with respect to the 8 U.S.C. § 1326 offense.

A district court's determination that a defendant is or is not entitled to a § 3E1.1 reduction, based on its evaluation of the defendant's acceptance of responsibility, is a predominantly factual determination "entitled to great deference on review." U.S.S.G. § 3E1.1, Application Note 5; see also United States v. Giwah, 84 F.3d 109, 112 (2d Cir. 1996) ("Whether there has been an acceptance of responsibility is a fact [ ] question and the circuit court will not reverse the district court's finding on the issue unless it is without foundation.") (internal quotation marks omitted). Here, however, we are presented with the more unusual circumstance that the district court's acceptance of responsibility determination may have rested in part on an antecedent legal conclusion—namely, that the collateral attack on the validity of Batista's deportation constituted a challenge to his factual guilt on the deportation element of the 8 U.S.C. § 1326 offense. We review purely legal conclusions de novo. See United States v. Charria, 919 F.2d 842, 849 (2d Cir.1990), cert. denied, 502 U.S. 813, 112 S.Ct. 62, 116 L.Ed.2d 38 (1991). But while we conclude that reliance on that particular legal theory would have been mistaken, the district court's conclusion that Batista had not accepted responsibility for his offense also rested upon additional factual grounds sufficient to permit our affirmance of that determination.

In stating its decision to deny an acceptance of responsibility adjustment, the district court explained that the "question [of the allegedly illegal deportation] is intertwined with the second element of the charge here, an element which the government had to prove at trial, that is, that the defendant was arrested and deported.... The issue was addressed at trial and, at the time he interposed his defense, was addressed by the defendant." In effect, it appears that the district court may have reasoned that by collaterally challenging the validity of his deportation, Batista was contesting whether he was "factually guilty" of having been properly deported for purposes of 8 U.S.C. § 1326.

■ As noted in Part III above, however, 8 U.S.C. § 1326 does not require that the alien have been "properly" or "lawfully" deported. See Mendoza–Lopez, 481 U.S. at 834–35 & n. 9, 107 S.Ct. at 2153 & n. 9 (noting that text, legislative history, and background of § 1326 indicate that Congress did not intend that validity of underlying deportation be contestable in a § 1326 prosecution). The lawfulness of a deportation proceeding is not an element of the § 1326 illegal reentry offense; the government need not offer proof of the deportation order's validity beyond a reasonable doubt in its case in chief. See United States v. Alvarado–Delgado, 98 F.3d 492, 493 (9th Cir.1996) (en banc), cert. denied —— U.S. ——, 117 S.Ct. 1096, 137 L.Ed.2d 228 (1997); Torres–Sanchez, 68 F.3d at 229; Holland, 876 F.2d at 1535. Batista's collateral due process challenge to the validity of his deportation, standing alone, does not raise an issue of his factual guilt with respect to an element of the 8 U.S.C. § 1326 illegal reentry offense (i.e. his actual deportation from the United States). Accordingly, his collateral attack—while admittedly "intertwined" with the element of deportation—is more properly characterized as an "issue[ ] that do[es] not relate to factual guilt," U.S.S.G. § 3E1.1, Application Note 2.

Were it true that Batista proceeded to trial solely for the purpose of asserting his collateral attack on the legality of the underlying deportation, we might be inclined to agree that he was entitled to a two-point acceptance of responsibility adjustment. See, e.g., United States v. Villasenor–Cesar, 114 F.3d 970, 972 (9th Cir.1997) (noting district court's two-point adjustment for acceptance of responsibility where defendant contested validity of deportation at trial, but had stipulated

before trial to alienage, prior arrest and conviction, prior deportation, and subsequent return to United States without permission). However, the district court noted, and the record demonstrates, that this was not the case: Batista's attorney sought to raise a defense that Batista lacked the specific intent to reenter the United States illegally; absent proof of that *mens rea*, the argument went, Batista's guilt on the 8 U.S.C. § 1326 element of reentry without permission could not be made out. *But see United States v. Newton*, 677 F.2d 16, 17 (2d Cir.) (per curiam) (holding that government need not show that defendant specifically intended to disobey the law in order to prove violation of 8 U.S.C. § 1326), *cert. denied*, 459 U.S. 850, 103 S.Ct. 111, 74 L.Ed.2d 98 (1982). Although ultimately averted by the district court's pretrial ruling that § 1326 required no showing of specific intent, this argument suggests that Batista did not accept responsibility for the illegality of his reentry. During the course of the trial, defense counsel also challenged a government witness testifying to the circumstances of Batista's June 19, 1990 departure from the United States, eliciting testimony that the INS agent could not identify Batista, and did not independently recall having escorted him to the departing aircraft—a line of questioning perhaps meant to suggest that Batista might not have been deported by the agent, and which, to the extent that it did so, cast doubt upon the fact (rather than the validity) of Batista's deportation. Moreover, Application Note 2 states that "a determination that a defendant has accepted responsibility [notwithstanding his insistence on a trial to assert issues unrelated to factual guilt] will be based primarily upon *pre-trial* statements and conduct." (emphasis supplied) While at trial Batista admitted to his narcotics convictions, and conceded that he had reentered the United States after having been deported, he refused the government's request to so stipulate prior to trial. Because the foregoing supply adequate grounds for the district court's conclusion that Batista did not demonstrate an acceptance of responsibility for his offense, we find no error in that decision and uphold the district court's denial of the acceptance of responsibility adjustment.[17]

## V.

In sum, we affirm (i) the district court's denial of Batista's 1995 motion to dismiss the indictment on speedy trial grounds, (ii) the 1996 judgment of conviction for violation of 8 U.S.C. § 1326, notwithstanding alleged defects in the underlying 1990 deportation proceeding, and (iii) the sentence imposed by the district court, which did not include a downward offense level adjustment for acceptance of responsibility.

[17]. While Batista's argument that he was entitled to a two-point adjustment under § 3E1.1(a) is at least colorable (although ultimately not convincing, as explained above), we note that we find *no* grounds on which he might have been able to lay claim to the additional one-point adjustment under § 3E1.1(b)(2). Far from "timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently," U.S.S.G. § 3E1.1(b)(2), Batista withdrew from a plea agreement and obliged the government to prove its case at trial.