**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kevin James COLLINS, Defendant–Appellant.**

**No. 95–10304.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 16, 1996.

Decided July 23, 1996.

---

Katherine Alfieri, Santa Rosa, California, for defendant-appellant.

George L. Bevan, Jr., Assistant United States Attorney, Oakland, California, for plaintiff-appellee.

Before: PREGERSON and TROTT, Circuit Judges, and EZRA,* District Judge.

TROTT, Circuit Judge:

Kevin James Collins was convicted by jury of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), and sentenced to prison. He raises six issues on appeal: (1) his indictment should have been dismissed because he was not brought to trial within the 180-day time limit of the Interstate Agreement on Detainers Act (IADA), 18 U.S.C. App. II; (2) the district court abused its discretion by admitting evidence that Collins burglarized a business shortly before his arrest, and that after his arrest he persuaded others to create a cover-up story about the gun; (3) his Sixth Amendment confrontation rights were violated because the district court limited the scope of his cross-examination of a government witness; (4) the district court erred by adding two points to his offense level for obstruction of justice; (5) the district court erred by adding four points to his offense level for possession of a firearm in connection with another felony offense; and (6) the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by striking two Hispanic potential jurors.

We affirm.

## BACKGROUND

The government's sole charge against Collins was that he possessed a pistol on February 12, 1994, thereby violating 18 U.S.C. § 922(g)(1) (felon in possession of a firearm). The only disputed element of the offense was whether Collins possessed the pistol.

*The Government's Case in Chief*

At approximately 11 p.m. on February 12, 1994, Concord Police dispatched Officer Michael Tumelson to the California Check Cashing building. When he arrived at the scene, Tumelson saw Collins and John Winn walking away from the rear of California Check Cashing. Winn stopped and stood in a brick enclosure while Collins walked down a sidewalk with his hands in his jacket pockets.

When Collins came to a bush near the sidewalk, he pulled his hands out of his jacket pockets, reached into the bush with both arms, then took his arms out of the bush and put his hands back into his jacket pockets. Tumelson did not see anything in Collins' hands, but believed that Collins was trying to hide something in the bush.

At this point, Winn came out from behind the wall and walked down the sidewalk toward Collins. When Winn walked by the bush, he slowed down a little bit but never stopped. Winn was wearing a black pullover sweatshirt with a hood, black pants, and black gloves.

Suspecting that Collins and Winn might be involved in criminal activity, Tumelson identified himself as an officer and ordered them to stop. A footchase followed and ended with the capture of Collins and Winn. Tumelson then returned to the bush and found the pistol, which was clean and free of debris. Tumelson picked up the gun with his hands and unloaded it.

The police lab later analyzed the gun for fingerprints but found none. However, a fingerprint specialist testified at trial that it is not unusual to find no fingerprints on a gun.

The pistol's ownership was traced to Benito Calisterio, an acquaintance of Collins. At trial, Calisterio testified that he had loaned the gun to Collins. Calisterio also testified that Collins called him from jail two days after his arrest and told him to tell the police that the gun had been taken from Calisterio's house without his knowledge by Latasha Hubbard, the cousin of Collins' girlfriend, Erika Hubbard. Collins told Calisterio that he had talked to Winn and that Winn had agreed to "take the rap" for the gun.

Between April and November 1994, Collins telephoned Calisterio collect from jail on numerous occasions wanting to know if Calisterio was sticking to the cover-up story. Calisterio's receipt of the calls was corrobo-

---

* The Honorable David Alan Ezra, United States District Judge for the District of Hawaii, sitting by designation.

rated by Calisterio's telephone records and the testimony of several record custodians from state prisons and jails who testified that Collins was at their respective facilities and had access to the phones on the dates of the calls.

The government also called Latasha Hubbard to the stand. She testified that the day after Collins' arrest, Erika Hubbard telephoned her and asked her to tell the police that she had taken the gun from Calisterio's house and then had given the gun to Winn. Latasha later met Erika and Calisterio at Calisterio's house and discussed the cover-up story. Erika told Calisterio that she had discussed the story with Collins. After their meeting, Erika and Latasha met with Collins at the jail.

Pursuant to their plan, Calisterio and Latasha told the cover-up story to the Concord police and the ATF. However, Latasha had trouble telling her part of the story because she could neither describe Winn nor the pistol. Shortly before the original trial date of November 16, 1994, Calisterio and Latasha recanted their stories and told ATF that the cover-up story was a lie.

*The Defense's Case*

Collins first called John Winn, who asserted his Fifth Amendment privilege in the presence of the jury. The district court determined that Winn's assertion of the privilege was valid, and on that basis, excused him.

Finding Winn "unavailable," the district court, over the government's objection, granted Collins' request to call other witnesses to testify to statements Winn allegedly made to them admitting that he had the gun in Concord.

Brandy Woods was one of these witnesses. She testified that on the evening of February 12, 1994, she drove Collins to the Concord shopping center, arriving somewhere between 10:50 and 11:00 p.m. Woods said that they went to Concord to celebrate Collins' admission to college, that Collins was wearing tight pants, and that if he had a gun, she would have seen it. When they found that the club they had intended to patronize had changed its format, they drove around the

shopping center looking for a payphone to call another club.

Woods testified that she and Collins got out of the car at a payphone near California Check Cashing. Collins walked near the check cashing building and met John Winn. Collins and Winn then ran to the rear of the building. Woods got back into her car and waited three to eight minutes before she saw them running toward the front, chased by police. Woods drove off without Collins. Woods also testified that she saw Winn near her house after Collins' arrest and asked him why he was "letting Kevin take his gun case when he knows Kevin didn't have the gun." Winn told her the gun was his.

The defense introduced into evidence the gloves and nylon stocking recovered from Winn during arrest.

*The Government's Rebuttal Case*

The government asked the court to allow it to show that Collins was at the California Check Cashing building to be a lookout for a burglary, not to go dancing. The court agreed, saying:

> It seems to me that the evidence being offered by the government is bona fide rebuttal to both the hearsay testimony of Collins (sic:Winn) as to who had the gun and where, and to Woods' testimony as to the reasons and circumstances under which Mr. Collins was there.

The government established the following facts in rebuttal: Just prior to 11:00 p.m. on the night of the arrests, a shopping center security guard, Eric Bradford, saw a black male (John Winn is black) and a white male (Collins appears white) coming from the rear of the California Check Cashing building. He saw them enter the breezeway next to the building, and then head toward the front of the building. They were walking at a very brisk pace, and their movements struck Bradford as unusual.

Bradford and his partner made a u-turn in their vehicle and drove back to California Check Cashing where Bradford saw the black male standing at the rear of a vehicle with the trunk open. The black male told Bradford's partner that they were leaving

the parking lot area. Bradford and his partner then drove off.

At approximately 11:09 p.m., personnel at Sonitrol (California Check Cashing's alarm company) heard the sounds of someone trying to break into the California Check Cashing building. Nearly a minute later, Sonitrol activated an audio recorder. This tape was played for the jury.

On the first three minutes of the tape, there are sounds of a person walking on the roof of the California Check Cashing building, tearing off the roofing, sawing, and hammering. When the hammer and sawing noises stop, the sound of quickly scampering footsteps can be heard. Then the noise on the rooftop ends.

The government demonstrated that the end of the rooftop noise coincided with the arrival of Officer Tumelson. Tumelson testified that the only persons he saw around the California Check Cashing building were Winn and Collins.

After hearing the evidence and the appropriate instructions, the jury convicted Collins. This timely appeal followed.

## I. Interstate Agreement on Detainers Act, 18 U.S.C. App. II [1]

Collins argues that the district court should have dismissed his indictment because he was not brought to trial within the 180-day period specified by the IADA, 18 U.S.C. App. II, art. III. The government and Collins agree that his federal trial started 229 days after the U.S. Marshal's office received his demand for a speedy trial. However, the parties disagree on: (1) when the 180-day clock was started; (2) whether the 180-day clock was tolled during the 17-day period Collins was away from his California prison to attend his state trial; (3) whether the trial court's tolling of the 180-day clock in the "interests of justice" stopped the clock for 30

or 34 days; and (4) whether Collins' motions in limine tolled the clock for 5 days.

As we will explain below: (1) the clock was started when Collins filed his demand with the court; (2) the clock stopped for 14 days while Collins traveled to and from his California state trial; (3) the clock was stopped in the interest of justice for only thirty days; and (4) Collins' motions in limine tolled the clock for five days. Under these determinations, only 176 days of the 180-day clock were used, and therefore the district court did not err by refusing to dismiss the indictment.

### 1. *When did the clock begin to run?*

On May 6, 1994, the U.S. Marshal in San Francisco received a copy of Collins' demand for a speedy trial. The Marshal filed a copy of the demand with the district court clerk on May 10, 1994. The precise question we address is whether the IADA clock began to run: (1) when the Marshal received the demand; or (2) the day Marshal filed the demand with the district court. This issue raises a question of law which we review de novo. *United States v. Hall,* 974 F.2d 1201, 1204 (9th Cir.1992).

Article III(a) of the IADA provides that a prisoner:

> shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for final disposition to be made of the indictment, information, or complaint.

18 U.S.C. App. II, art. III(a). In *Fex v. Michigan,* 507 U.S. 43, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993), the Supreme Court interpreted this provision to mean that the 180-day clock does not start until the defendant's demand "has actually been delivered to the

---

1. The IADA has been adopted by forty-eight states, the Congress, the District of Columbia, Puerto Rico, and the United States Virgin Islands. *Birdwell v. Skeen,* 983 F.2d 1332, 1335 (5th Cir.1993). The IADA is designed to encourage the expeditious and orderly disposition of charges filed in one jurisdiction against persons already incarcerated in another jurisdiction. 18 U.S.C. App. II, art. I. Before the IADA was enacted, there was no legal mechanism for prisoners to clear detainers filed against them by authorities outside the jurisdiction in which they were imprisoned. *Birdwell,* 983 F.2d at 1335.

district court and prosecuting officer that lodged the detainer against him." *Id.* at 52, 113 S.Ct. at 1091.

Here, Collins and the government agree that delivery to the U.S. Marshal fulfilled the requirement of delivery to the prosecuting officer. Collins goes further and argues that delivery to the Marshal also constituted delivery to the district court.

An argument similar to the one Collins raises here was rejected by the Supreme Court in *Fex.* In that case, the Supreme Court held that a prisoner could not start the clock by giving his demand to the prison authorities. Instead, the clock would start when the court and prosecuting officer received the notice. *Id.* at 46–51, 113 S.Ct. at 1088–90. The Court stated that this result would occur even if the warden maliciously delayed forwarding the prisoner's request or didn't send the demand at all. *Id.* at 49–50, 113 S.Ct. at 1089–90.

■ In other words, *Fex* instructs us that the IADA means what it says. And when it says that the prisoner must have his demand "delivered to the ... appropriate court," that is what it means. *See* 18 U.S.C. App. II, art. III(a). Delivery to the Marshal on May 6, 1994 did not constitute delivery to the court because the Marshals are not agents for the court for purposes of accepting every request they find thrust upon them. Delivery to the court did not occur until May 10, 1994 when Collins' demand was filed. Therefore, we hold that the IADA's 180–day clock began to run on May 10, 1994.

### 2. *Was the IADA clock tolled while Collins attended his California state court trial?*

On June 20, 1994, the government obtained a writ of habeas corpus *ad prosequendum* ordering that Collins be brought from the California State Prison at Ione for an initial appearance before a U.S. Magistrate in San Francisco on July 8, 1994. However, from June 24, 1994 until July 11, 1994, Collins was not at Ione. On June 24th, he was transferred to Sacramento County for state criminal proceedings pursuant to a June 9, 1994 order signed by Sacramento Superior Court Judge Gary S. Muller. On June 28, 1994, Collins appeared in state court in Sacramen-

to County, pled guilty, and was sentenced. On July 5, he was moved to the Deuel Vocational Institution. Finally, on July 11th, he was transferred back to Ione. Collins was not released from Judge Muller's order until July 11, pursuant to California Penal Code § 2620.

The government argues that the entire 17–day period between June 24 and July 11 is tolled under Article VI(a) of the IADA. This article states:

> In determining the duration and expiration dates of the time periods provided in articles III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction over the matter.

18 U.S.C. App. II, art. VI(a). The district court found the government's argument persuasive and tolled the entire 17–day period because "the record shows Mr. Collins was not available for federal custody during the period June 24th through July the 11th because of these other state proceedings." The district court, however, never specified what test, if any, it used to determine Collins' unavailability.

■ This court has never addressed what standard a district court should use to determine whether a defendant is "unable to stand trial" for the purposes of tolling the IADA's 180–day clock. Therefore, a question of law is presented which we review de novo. *United States v. Hall,* 974 F.2d at 1204.

At least three different standards are used by other circuits to determine whether a prisoner is unable to stand trial under the IADA. The Fifth Circuit considers only the defendant's physical and mental incapacity. The Seventh and Eighth Circuits will toll the clock if the defendant is either "legally or administratively" unavailable. Finally, the Second and Fourth Circuits apply the Speedy Trial Act's, 18 U.S.C. § 3161, provisions for tolling. We will examine each in turn.

Collins argues that we should follow the Fifth Circuit and examine only whether he was physically or mentally incapacitated.

We disagree because this standard is too narrow. The Fifth Circuit adopted its standard on the ground that before the IADA was enacted, the phrase "unable to stand trial" referred only to a prisoner's physical or mental ability to stand trial, and the court refused to infer that the drafters of the IADA wanted a broader definition. *Birdwell v. Skeen*, 983 F.2d at 1340–41.

Our concern with the Fifth Circuit's analysis is that IADA specifically addresses mental incapacity-half of the Fifth Circuit's definition of "unable to stand trial." Under the terms of the IADA, the IADA does not apply to persons who are mentally ill. *See* 18 U.S.C. App. II, art. VI(b) ("No provision of this agreement, and no remedy made available by this agreement shall apply to any person who is adjudged to be mentally ill."). Had the drafters of the IADA wanted to exclude only the physically incapacitated, in addition to the mentally ill, they would have done so explicitly.

We also decline to adopt the second possible test, "legally or administratively" unavailable, *see Young v. Mabry*, 596 F.2d 339, 343 (8th Cir.), *cert. denied*, 444 U.S. 853, 100 S.Ct. 107, 62 L.Ed.2d 69 (1979); *United States v. Roy*, 830 F.2d 628, 635 (7th Cir. 1987), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1033, 98 L.Ed.2d 997 (1988), because this test is too broad. It provides little guidance to the district courts and its meaning could only be developed slowly on a case-by-case basis.

■ The third possible test, applying the tolling provisions of the Speedy Trial Act, 18 U.S.C. § 3161(h)(1)–(9), is the most sensible. We join the Second and Fourth Circuits in justifying this approach on the ground that the Speedy Trial Act and the IADA serve the same purposes. *United States v. Cephas*, 937 F.2d 816, 819 (2nd Cir.1991), *cert. denied*,

502 U.S. 1037, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992); *United States v. Odom*, 674 F.2d 228, 231 (4th Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2946, 73 L.Ed.2d 1341 (1982).[2] In addition, the case law on the Speedy Trial Act's tolling provisions is fairly well developed, thus giving district courts guidance in interpreting the IADA.

In this case, the most analogous tolling provisions of the Speedy Trial Act are contained in 18 U.S.C. §§ 3161(h)(1)(A) and 3161(h)(1)(H). Section 3161(h)(1)(A) tolls the clock for any "delay resulting from any proceeding" including other trials. Section 3161(h)(1)(H) provides for tolling for any reasonable

> delay resulting from transportation of any defendant from another district, or to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation shall be presumed to be unreasonable.

In *United States v. Nash*, 946 F.2d 679, 680 (9th Cir.1991), we further clarified section 3161(h)(1)(H) to create a presumption of reasonableness for all transportation times of ten days or less.

■ Applying §§ 3161(h)(1)(H) and 3161(h)(1)(A) to the facts of this case results in fourteen days tolled. It took three days for Collins to be transported to trial; these three days are excluded under § 3161(h)(1)(H). The state trial took one day; this day is excluded under § 3161(h)(1)(A). Finally, it took twelve days to transfer Collins back to Ione; the first ten of these days are presumed reasonable and therefore tolled under § 3161(h)(1)(H).[3]

**2.** We partially adopted *Cephas* and *Odom* in *United States v. Johnson*, 953 F.2d 1167, 1171–72 (9th Cir.), *cert. denied*, 506 U.S. 879, 113 S.Ct. 226, 121 L.Ed.2d 163 (1992). In *Johnson*, we held that "[w]here delay is excludable under the Speedy Trial Act because it is attributable to a defendant's own motions, the running of the Interstate Detainers Act's speedy trial clock is also tolled." *Id.* at 1172. However, *Johnson* did not go so far as to state that *any* delay excusable under 18 U.S.C. § 3161(h)(1)–(9) also tolls the clock under the IADA.

**3.** Collins argues that the clock should have been restarted on July 5th when he arrived at the Deuel Vocational Institution. After inspecting the record, we reject this argument because the Deuel Vocational Institution only served as a transfer station for Collins' transport back to Ione. Moreover, until Collins was returned to Ione, he remained under the jurisdiction of the California court which had tried him. Cal.Penal Code § 2620.

### 3. *Tolling for the continuance Collins requested*

Originally, Collins' trial was set to begin on November 16, 1994. However, on the morning of the trial, Collins requested a continuance. The district court granted the motion and declared that "in the interests of justice", the Speedy Trial clock-and therefore the IADA clock-would be tolled from November 16 through December 16. However, the Court later issued a written order extending the tolling period until December *20,* 1994.

██ The district court was allowed to grant the 30–day continuance and toll the IADA clock under 18 U.S.C. App. II, art. III(a) which states, in pertinent part: "That *for good cause shown in open court, the prisoner or his counsel being present,* the court having jurisdiction may grant any necessary or reasonable continuance." (emphasis added). However, there is no provision for the district court to unilaterally and without a hearing extend the continuance-and its attendant tolling-an additional four days. *See Snyder v. Sumner,* 960 F.2d 1448, 1454–56 (9th Cir.1992) (good cause for continuance must be shown in open court). Therefore, we permit only 30 days to be subtracted for purposes of the 180–day IADA clock calculation.

### 4. *Tolling of period due to Collins' in limine motions*

██ Collins filed a motion in limine on November 10, 1994. The court tolled the IADA clock when it granted an "ends of justice" continuance on November 16, 1994. We must decide whether Collins' motion in limine tolled the IADA clock for the period between these two dates.

Collins argues that motions in limine do not toll the Speedy Trial Act and, therefore, the IADA was not tolled.[4] We rejected this argument in *United States v. Springer,* 51 F.3d 861, 865 (9th Cir.1995). Hence the district court properly tolled the five days between November 10 and November 16.

██ After subtracting all of the days that were tolled, we calculate that 176 days of the IADA's 180–day clock were used before Collins' trial began. Therefore, the district court did not err by refusing to dismiss Collins' indictment.

## II. Did the district court abuse its discretion by admitting prejudicial evidence regarding Collins' involvement in the burglary and the post-arrest cover-up story?

Collins argues that the district court abused its discretion by admitting evidence of the California Check Cashing burglary and his post-arrest attempt to have others lie on his behalf to the police. He claims that both types of evidence should have been excluded because their probative value is substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403. This argument is without merit.

██ The evidence of the Collins' attempts to induce witnesses to lie is indicative of consciousness of guilt and may be placed before the jury. *See United States v. Brashier,* 548 F.2d 1315, 1325 (9th Cir.1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977). The district court did not abuse its discretion by holding that the probative value of this evidence was not substantially outweighed by its prejudicial effect.

██ The evidence that Collins and Winn were at the California Check Cashing building to commit a burglary was also properly admitted. In general, evidence of other crimes committed by the defendant-such as the attempted burglary here-is inadmissible. *See* Fed.R.Evid. 404(b). However, an exception to this general rule is that evidence of other criminal activity may be used for the purpose of providing the context in which the charged crime occurred. *United States v. Vizcarra–Martinez,* 66 F.3d 1006, 1013 (9th Cir.1995). This exception is most often applied in felon-in-possession cases because of the difficulty that the prosecution would encounter in proving that the defendant pos-

---

**4.** Under our decision in *Johnson,* 953 F.2d at 1172, if a defendant's motion tolls the Speedy Trial Act, it also tolls the IADA.

sessed a gun and in rebutting his proffered defense without relating the facts surrounding the commission of the crime. *Id.* "The jury cannot be expected to make its decision in a void-without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *United States v. Daly,* 974 F.2d 1215, 1216 (9th Cir.1992) (quoting *United States v. Moore,* 735 F.2d 289, 292 (8th Cir.1984)).

█ Here, Collins introduced evidence purporting to show that he was in the neighborhood for dancing, not burglary. Had the government not introduced the rebuttal testimony, the jury would have been left wondering why Collins would have wanted a gun. The government's evidence provided an answer: he was acting as the lookout for a burglary. Under these circumstances, the district court did not abuse its discretion by admitting evidence of the burglary.

**III.** **Did the district court violate Collins' Sixth Amendment confrontation rights by limiting the scope of his cross-examination of a government witness?**

Collins asserts that the district court abused its discretion when it refused to allow him to attack Calisterio's credibility by asking him whether he was a drug dealer and whether he lied when he told friends that the police broke down his door and arrested him for a traffic ticket. The district court prohibited these questions under Fed.R.Evid. 608(b) which states, in part:

> Specific instances of conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than for conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness....

█ Collins contends that our decision in *United States v. Ray,* 731 F.2d 1361, 1364 (9th Cir.1984), compels us to hold that the district court abused its discretion by not permitting him to ask Calisterio if he was a

drug dealer. Collins reads *Ray* too broadly. In *Ray* we held that a district court abuses its discretion by not allowing cross-examination about a witness' continuing drug dealing where the drug dealing might bias the testimony of the witness. However, we cautioned that our holding was limited to cases where the defendant offers a "threshold level" of evidence that the witness's drug dealing might cause bias. *Id.* Collins completely failed to make this showing: when asked by the court how Calisterio's drug dealing might cause bias, Collins' lawyer's only response was:

> Well, the bias is that-I think, you know, that his dealings with drugs had something to do with his changing history. I know that maybe that's speculative. Maybe I won't get it into evidence. But I believe that it's not irrelevant.

Given this weak response, the district court did not abuse its discretion by prohibiting Collins from inquiring into Calisterio's alleged drug dealing.

█ Nor did the court abuse its discretion by refusing to allow Collins to ask Calisterio if he told others that the police broke down his door and arrested him for a traffic ticket. Despite the district judge's questioning, Collins could not explain how this alleged incident was connected with his case. Therefore, the district court did not abuse its discretion by invoking Fed.R.Evid. 608(b) and prohibiting the disputed questions.

**IV.** **Did the district court err in adjusting Collins' offense level upward for obstruction of justice pursuant to USSG § 3C1.1?**

Section 3C1.1 of the United States Sentencing Guidelines requires a two-level enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense...." Collins argues that this section should not apply to him because the police never believed the lies he instructed others to tell: i.e., they did not *sig-*

*nificantly* obstruct or impede the investigation. This argument is not persuasive.

Collins argues that his conduct falls under § 3C1.1 app. note 3(g), which states that an enhancement for obstructing or impeding justice is proper when the defendant "provid[ed] a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." However, this application note only applies to the *defendant's* lies to the police; here, Collins instructed *others* to do the lying.

 The correct application note of § 3C1.1 is 3(a). This note explains that obstruction of justice includes "threatening, intimidating or otherwise *unlawfully influencing a . . . witness* ... directly or indirectly, or attempting to do so." (emphasis added). It is unlawful to instruct others to lie to the police and perjure themselves. 18 U.S.C. § 1512; *see United States v. Pofahl*, 990 F.2d 1456, 1481–82 (5th Cir.) (defendant violated 18 U.S.C. § 1512(b) by writing letter to husband imploring him not to provide the authorities with incriminating information), *cert. denied*, 510 U.S. 898, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993). Therefore, it does not matter that, in the end, Collins' unlawful influence scheme fooled no one, he still obstructed justice organizing the cover-up story. We affirm the two-level enhancement.

**V. Did the district court err in assessing a four-level enhancement pursuant to USSG § 2K2.1(b)(5) for possession of a firearm in connection with another felony offense?**

 Collins argues that the pistol played no role in the attempted burglary and therefore enhancement under 2K2.1(b)(5) was improper.[5] We disagree. Enhancement under 2K2.1(b)(5) is proper whenever a firearm "facilitated or potentially facilitated-i.e. had some emboldening role in-a defendant's felonious conduct." *United States v. Routon*, 25 F.3d 815, 819 (9th Cir.1994). Here, Collins carried a loaded pistol during a nighttime burglary. It was not clearly erroneous

to infer that the pistol had some emboldening role in Collins' felonious conduct.

**VI. Did the prosecutor's use of two preemptory challenges on Hispanic jurors constitute purposeful discrimination in violation of *Batson v. Kentucky*?**

 During voir dire, the government exercised its first two preemptory challenges against Hispanic males, Mr. Castaneda and Mr. Padilla. Defense counsel objected and made a *Batson* challenge. *See Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). The prosecutor immediately offered a race-neutral explanation for the challenges:

> I struck Mr. Padilla because he seems to be a loner type from Concord, expressionless, in essence. Mr. Castaneda was different. He answered too quickly. I just didn't get a good reaction from him.

The district court judge found that the prosecutor's explanations for the challenges were satisfactory and also noted that he thought Mr. Castaneda behaved strangely.

 The trial court's factual findings regarding purposeful discrimination in jury selection are entitled to "great deference" and will not be set aside unless clearly erroneous. *United States v. Vasquez–Lopez*, 22 F.3d 900, 901 (9th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 239, 130 L.Ed.2d 162 (1994). Here, there is no indication that the district court's finding of no purposeful discrimination was clearly erroneous.

**AFFIRMED.**

---

5. Collins also argues that there was insufficient evidence to find that he was involved in the

burglary. After reviewing the evidence, we find this argument to be without merit.