[No. E040033. Fourth Dist., Div. Two. Feb. 22, 2008.]

PHILLIP NETZLEY, Petitioner, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

Doreen Boxer, Public Defender, Gerald Farber, Interim Public Defender, Jerry Bynum, Chief Deputy Public Defender, and George Wright, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Michael A. Ramos, District Attorney, Grover D. Merritt, Mark Vos and Brent J. Schultze, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**McKINSTER, J.**—Petitioner, Phillip Netzley, moved to dismiss criminal charges pending against him because of an alleged violation of the Interstate Agreement on Detainers (IAD). (Pen. Code,[1] § 1389.) The trial court denied the motion to dismiss, and petitioner filed for a writ of mandate.

The issue presented in this case is whether petitioner was "unable to stand trial, as determined by the court having jurisdiction of the matter," within the meaning of the IAD, while he was serving a term of disciplinary segregation as the result of his repeated misconduct and violence in prison. We agree with the lower court's determination that the period of delay during which petitioner was in Oregon's Intensive Management Unit (IMU) rendered him "unable to stand trial" and tolled the running of the 180-day statutory period from January 30 to July 28, 2005 (a total of 179 days). When petitioner moved to dismiss on November 4, 2005, the 180-day period had not yet expired, and he could still have been brought to a timely trial under the provisions of the IAD.

---

[1] All subsequent statutory references are to the Penal Code.

## FACTS AND PROCEDURAL BACKGROUND

On or about December 20, 2003, petitioner allegedly committed several criminal acts in San Bernardino, California. Preliminary hearing testimony established that petitioner created a disturbance at the Wooden Nickel Bar, left after a physical altercation with the bar's owner and returned sometime later with a handgun. Upon his return, petitioner purportedly opened fire on bar staff, firing two shots at bartenders. One went into the wall and one into the chest of the bar owner. A warrant was issued for petitioner's arrest on January 14, 2004.

On October 19, 2004, petitioner was admitted to the Two Rivers Correctional Institution in Umatilla, Oregon (Two Rivers), after convictions on third degree assault and first degree intimidation charges. The following day, petitioner began a pattern of disorderly, disobedient and violent conduct in prison. Petitioner was placed in administrative segregation for second degree assault and other disciplinary infractions from October 20, 2004, through December 28, 2004.

Pursuant to petitioner's desire for immediate disposition of the charges pending in California, on January 28, 2005, a proper IAD request was sent from the Two Rivers facility to the District Attorney of San Bernardino County (DA). The forms were received by the DA on February 3, 2005.

On January 30, 2005, two days after submitting his IAD request to the warden of Two Rivers, petitioner committed first degree assault and various other infractions that led to a $200 fine and a term in disciplinary segregation from January 30, 2005, until July 28, 2005. Petitioner was transferred from Two Rivers and placed in the IMU at Snake River Correctional Institution (Snake River). According to the administrative rules of the Oregon Department of Corrections, a prisoner is transferred to IMU when he, ". . . demonstrates the need for maximum custody housing by demonstrating behaviors that cannot be controlled in other housing as indicated by high severity and/or chronic misconduct sanctions, escape activity or security threat group activities causing serious management concerns." (Or. Admin. R. 291-055-0019 (2007).) Petitioner's bad behavior in prison did not end while he was housed at Snake River. He committed first degree assault in April and June 2005, while in disciplinary segregation, and was cited for disorderly and disobedient behavior on numerous occasions.

On March 14, 2005, the DA informed the Oregon Department of Corrections that all of the necessary IAD documents had been executed and that San Bernardino County wanted to receive the prisoner as soon as possible, "pending . . . subject's availability for transport." An e-mail

response from the Oregon Department of Corrections indicated that the request for transport to San Bernardino County was "DENIED" because "[u]nder the terms of the sanction [disciplinary segregation], [petitioner] will not be free to travel until after 7/28/2005." Previously, several e-mails were sent between personnel at the Oregon Department of Corrections. In one such e-mail, an employee told another that the "DOC could release [petitioner] but they really do not like too [*sic*] because the Disciplinary Segregation time runs while [petitioner] is out on the IAD." Another Oregon Department of Corrections employee responded that she was going to send the DA formal notice of petitioner's unavailability so that the DA would be protected against any writ that petitioner might later file.

On March 16, 2005, an official letter was sent from Two Rivers in Oregon to the DA. The letter stated that petitioner had been "**denied** transfer of custody until after the date of **July 28, 2005** because [petitioner] is currently housed in a disciplinary segregation unit for assault. The Interstate [A]greement on [D]etainers offers protection to receiving states if the sending state does not make the inmate available; the period is tolled during any time that the defendant is 'unable to stand trial.' " (Original boldface.) The notion that petitioner "could" be released, but the Oregon Department of Corrections "really [does] not like too [*sic*]" was never expressed to the DA. All official correspondence to the DA indicated that transport prior to July 28, 2005, was not an option due to the disciplinary action caused by petitioner's conduct. Furthermore, a message received by an employee at the DA's Office indicated that Oregon officials also felt petitioner was "too dangerous for transport."

Petitioner was transferred to San Bernardino County on August 14, 2005, to face charges for possession of a firearm by a felon (§ 12021, subd. (a)(1)), discharge of a firearm with gross negligence (§ 246.3), and assault with a firearm (§ 245, subd. (a)(2)). Transport occurred 17 days after the end of petitioner's term in disciplinary segregation in Oregon. On November 4, 2005, petitioner's counsel filed a motion to dismiss the charges pending in San Bernardino County. The motion alleged that the 180-day time limit to commence trial under the IAD had expired. The motion was denied on December 12, 2005, but petitioner waived time from that date until February 27, 2006, to prepare a petition for a writ of mandate. On March 7, 2006, petitioner waived additional time to finish preparing his writ petition. The petition was filed with this court on March 10, 2006.

## DISCUSSION

The IAD is a compact among the states that establishes "procedures for the transfer of prisoners incarcerated in one jurisdiction to custody of

another jurisdiction where criminal charges are pending." (35 C.J.S. (2007) Extradition and Detainers, § 68.) The IAD enables a state to gain temporary custody of a prisoner in order to try him or her on criminal charges. (35 C.J.S., *supra*, Extradition and Detainers, § 68.) Under article III of the IAD, a defendant "shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment . . . ." (§ 1389, art. III, subd. (a).) If the defendant is not brought to trial within the 180-day statutory period, pending charges are dismissed with prejudice. (§ 1389, art. V, subd. (c).)

In determining the duration and expiration dates of the time period, there are two statutory exceptions when the period may exceed 180 days. Under article VI, subdivision (a) of the IAD, "the running of said time periods shall be tolled whenever and for as long as *the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.*" (Italics added.) Article III, subdivision (a) identifies "good cause shown in open court" as an additional reason for the trial court to extend the time limit. This extension is designed to cover situations where the 180-day period is going to expire imminently, and the time period should be extended for good cause. (*People v. Posten* (1980) 108 Cal.App.3d 633, 643 [166 Cal.Rptr. 661] (*Posten*) [stating that the unavailability of witnesses is a good cause].) The "good cause" provision is not implicated in this case. Therefore, we concern ourselves only with the applicability of the tolling provision.

### 1. *Administrative or Legal Unavailability Can Render a Defendant "Unable to Stand Trial"*

There are three different interpretations of the term "unable to stand trial." (*U.S. v. Collins* (9th Cir. 1996) 90 F.3d 1420, 1426 (*Collins*).)

The Fifth Circuit has adopted the narrowest interpretation. It interprets the term to mean a prisoner is unable to stand trial only when a prisoner is physically or mentally incapacitated and therefore unable to stand trial. (*Collins, supra*, 90 F.3d at pp. 1426–1427.)

A second interpretation adopted by the Second, Fourth and Ninth Circuits simply applies the same tolling provisions contained in the Speedy Trial Act of 1974 (18 U.S.C. § 3161(h)(1)–(9)). (*Collins, supra*, 90 F.3d at p. 1427.)

A third interpretation, followed by the Seventh and Eighth Circuits, among other jurisdictions, is the broadest and determines a prisoner to be unable to stand trial whenever the prisoner is " 'legally or administratively' " unavailable. (*Collins, supra*, 90 F.3d at p. 1427.)

The court in *Collins* rejected an interpretation based only on a prisoner's physical or mental capacity. "Had the drafters of the [IAD] wanted to exclude only the physically incapacitated, in addition to the mentally ill, they would have done so explicitly." (*Collins, supra,* 90 F.3d at p. 1427.) We reject it also. As a Florida court observed, " 'it doesn't matter whether [a prisoner] was physically incapacitated or not . . . .' . . . It is generally accepted that a defendant may be unable to stand trial for reasons other than physical or mental disability." (*Fuente v. State* (Fla. 1989) 549 So.2d 652, 655–656.)

The court in *Collins* adopted the interpretation that applies the same tolling provisions of the Speedy Trial Act. (*Collins, supra,* 90 F.3d at p. 1427.) We respectfully disagree because such an approach is not consistent with the express language and intent of the IAD. It ignores and undermines the discretion of "the court having jurisdiction of the matter" (§ 1389, art. VI, subd. (a)) to determine whether a prisoner is unavailable to stand trial based on the unique facts of each case, and article IX of the IAD specifies that "[t]his agreement shall be liberally construed so as to effectuate its purposes."

The *Collins* court rejected the interpretation that a prisoner is unavailable to stand trial whenever the prisoner is legally or administratively unavailable. It did so virtually out of hand and with minimal analysis only stating, "[T]his test is too broad. It provides little guidance to the district courts and its meaning could only be developed slowly on a case-by-case basis." (*Collins, supra,* 90 F.3d at p. 1427.) Again, we respectfully disagree.

The *Collins* court, in part, adopted an interpretation embracing the tolling provisions of the Speedy Trial Act because there is already extant a considerable body of case law interpreting its tolling provisions which would give guidance to the district courts. (*Collins, supra,* 90 F.3d at p. 1427.) We understand the *Collins* court's desire to provide district courts with an instant readymade body of law to guide their interpretation of the IAD. However, we see nothing wrong with a case-by-case development of the law based on the unique facts of each case. Indeed, that is the way law is established in the common law tradition.

■ We adopt the third interpretation that a prisoner is unavailable to stand trial whenever the prisoner is legally or administratively unavailable as determined by the court having jurisdiction of the case.

Our approach to interpretation of the term "unable to stand trial" does not vest unfettered discretion in the court having jurisdiction of the matter because we imply a reasonableness standard to the actions of the officials in the sending and receiving states, as we will more fully explain below, when a court determines the issue of a prisoner's unavailability to stand trial.

## 2. *Legal or Administrative Unavailability Includes Periods of Delay Caused by the Defendant*

It is well established among state and federal courts that the statutory language " ' "unable to stand trial" ' " includes "all those periods of delay occasioned by the defendant." (*United States v. Scheer* (2d Cir. 1984) 729 F.2d 164, 168–169 [finding that a defendant's motions for new counsel, copies of court transcripts, and to suppress evidence all tolled the statutory period]; see *Posten, supra,* 108 Cal.App.3d at p. 643 [concluding that a defendant's refusal by disruptive behavior to board an airplane tolled the 180-day period while alternative transport was arranged]; *United States v. Boggs* (5th Cir. 1980) 612 F.2d 991, 993 (*Boggs*) [holding that a defendant who delayed his own trial by reneging on an agreement to plead guilty could not benefit from the delay]; *U.S. v. Dawn* (7th Cir. 1990) 900 F.2d 1132, 1136 [finding that a defendant's motion to dismiss tolled the 180-day period].)

While many of these cases included delays occasioned by various motions, there is no reason to limit a tolling to procedural delays in court. (*U.S. v. Dawn, supra,* 900 F.2d at p. 1136.) Rather, "[t]he inability [to stand trial] may be imposed by other kinds of restraint . . . ." (*State ex rel. Taylor v. McFarland* (Mo.Ct.App. 1984) 675 S.W.2d 868, 873 (*McFarland*).) For example, in *McFarland* a legal restriction imposed upon the defendant served to toll the IAD countdown. (*McFarland,* at p. 873.) The defendant was "unable to stand trial" because a California prison obeyed a court order requiring the defendant to remain in the state to testify in a court proceeding. (*Ibid.*)

Similar to the restriction imposed by the prison officials in *McFarland, supra,* 675 S.W.2d 868, the Oregon Department of Corrections legitimately kept petitioner in Oregon pursuant to the prison's administrative decision that he serve six to seven months in IMU. The fact that the prison in *McFarland* was compelled by a judge's order rather than a prison's administrative decision does not make it any less valid, in our view. Both are institutions having authority over the defendant. Oregon prison officials kept petitioner in the sending state for valid policy reasons. In *McFarland,* the policy reason was judicial administration. The defendant was a witness in a pending trial. In petitioner's case, the policy reasons are twofold. First, the time in IMU was disciplinary, to correct his bad conduct in prison. Second, the Oregon Department of Corrections sought to separate petitioner from the general prison population in order to protect inmates from his violent behavior. Certainly, the first policy would be defeated if his administrative segregation time expired while he was out to court in California.

The IAD countdown was tolled automatically from February 3, 2005, the date the DA received the forms,[2] until July 28, 2005, when the disciplinary segregation time expired, because petitioner was "unable to stand trial, as determined by the court having jurisdiction of the matter." (§ 1389, art. VI, subd. (a).)

### 3. *The Actions of the Sending Jurisdiction (Oregon) Were Reasonable*

The IAD is intended to "encourage the expeditious and orderly disposition" of any outstanding criminal charges. (§ 1389, art. I.) The delay by Oregon prison officials in sending petitioner to authorities in San Bernardino was reasonable and does not offend the purposes of the IAD. We agree with petitioner that the IAD seeks to protect prisoners against arbitrary, retaliatory, or unlawful actions by prison officials. For this reason, we examine Oregon's delay in light of the "reasonableness standard" adopted in *People v. Wilson* (1977) 69 Cal.App.3d 631, 635–636 [138 Cal.Rptr. 259] (*Wilson*). Concededly, this requires widening the scope of the test beyond the period of delay between defendant's request for rendition and receipt of a prisoner's IAD forms, as applied by the court in *Wilson*, to include the period between receipt of the forms and commencement of the prisoner's trial. Our expansive application of the reasonableness test is still consistent with the notion that in order to preserve a prisoner's right to a trial, delays occasioned by a warden's negligence, willful misconduct, or unreasonable delays should not serve to toll the 180-day time limit. (*Fex, supra,* 507 U.S. at pp. 50–52 [establishing that a warden's delay in forwarding a prisoner's IAD request should not adversely affect the prisoner's right to a speedy trial]; *People v. Lincoln* (1979) 42 Colo.App. 512, 516 [601 P.2d 641] [finding that the adverse consequences of official oversights should not be visited on the prisoner].) Without an implied requirement that the sending state's duty will be performed reasonably, an inmate's rights to an expeditious trial may never mature. (*Wilson, supra,* 69 Cal.App.3d at p. 638.)

Petitioner was transferred to the correctional institution at Snake River after Oregon officials had received and sent notice of his IAD request and, significantly, after he committed an assault. The record does not demonstrate that this disciplinary action was arbitrary, retaliatory, or a pretext for Oregon's alleged noncompliance with the act. Under Oregon law, assault in the first degree is a Class A felony whereby a person "[i]ntentionally causes serious physical injury to another by means of a deadly or dangerous weapon." (Or. Rev. Stat. § 163.185.) Disciplinary segregation in IMU is a reasonable corrective action for such a severe offense, especially in light of

---

[2] See *Fex v. Michigan* (1993) 507 U.S. 43, 51 [122 L.Ed.2d 406, 113 S.Ct. 1085] (*Fex*) ("Indications in the text of Article III [of § 1389] confirm, in our view, that the receiving State's receipt of the [IAD] request starts the clock").

the fact that petitioner received similar punishment for a lesser offense in October 2004, before petitioner made his request pursuant to the IAD. Furthermore, while he was housed in IMU, petitioner committed three additional violations, including another act of first degree assault.

Rather than leveraging these additional violations to increase petitioner's time in IMU, Oregon prison officials opted to impose alternate sanctions, such as loss of the segregation yard and fines, which did not increase the time he was "unable to stand trial." If anything, it appears petitioner possibly received lighter punishment than he would have because the Oregon Department of Corrections had already promised transport after July 28, 2005. The nature of petitioner's prison offenses and the manner in which corrective discipline was imposed belies his contention that he was transferred and held in IMU in order simply to allow Oregon officials to flout their statutory duty under the IAD by unreasonably delaying his prosecution for the charges pending in California.[3] The Oregon officials acted reasonably and legitimately imposed administrative corrective discipline in apparent good faith.

This also is not just an instance of simple inaction on the part of Oregon prison officials. Their denial of transport was limited to the time period petitioner was housed in IMU for assault. Shortly after petitioner's release from the facility, Oregon kept its promise, and petitioner was transported to San Bernardino County. From their perspective, prison officials had a legitimate administrative interest in not sending petitioner to answer the charges against him in California before the termination of his disciplinary segregation on July 28, 2005. If Oregon officials had transferred custody of petitioner to San Bernardino County before this date, the remaining time he owed in administrative segregation would have been lost since it would have continued to run and ultimately expire while he was away.

 The warden of a state prison is not an arm of the court (*U.S. v. Nesbitt* (7th Cir. 1988) 852 F.2d 1502, 1516, fn. 15) and does not act unlawfully simply because he chooses to exercise his discretion. Undercutting the discretionary power of the sending state's prison officials to administer programs designed to control, discipline, and aid those whose welfare and supervision they are charged with does not foster the implementation of cooperative procedures between states. (§§ 1389, art. I, 1389.2.) We agree that petitioner should not suffer prejudice by virtue of an unreasonable delay. (*Posten, supra*, 108 Cal.App.3d at p. 644.) However, this is not to say that he should benefit from a situation caused by his own misconduct in prison. Oregon officials should not be compelled under the authority of the IAD to

---

[3] Nor does the record support an inference that petitioner was just routinely placed in administrative segregation pending transport simply because he had made his IAD request for rendition, as petitioner contends occurs in some jurisdictions.

release petitioner from disciplinary segregation prematurely. That would place him in a better position than he would have been in had he not filed his IAD request. Such a result is not only inconsistent with the purpose of the IAD, it would allow petitioner to take advantage of his own wrongdoing. A prisoner who creates a situation in which the IAD is violated cannot then benefit from it. (*Boggs, supra,* 612 F.2d at p. 993.)

### 4. *The Actions of the Receiving Jurisdiction (San Bernardino County) Were Reasonable*

■ Petitioner claims that the DA should have commenced legal action against Oregon officials to secure custody and, because he did not, he should suffer the adverse consequences of Oregon's purported failure to comply. However, the IAD does not make provision for the district attorney in the receiving state to force officials in the sending state to comply with the IAD. Compliance with the IAD is only encouraged. The officials in the sending and receiving states "are hereby directed to enforce the agreement on detainer and to co-operate with one another and with other states in enforcing the agreement and effectuating its purpose." (§ 1389.2.) There is simply no express provision in the legislation for its enforcement.

In *Wilson,* the Court of Appeal stated in dictum that, "While the district attorney's office cannot insure the compliance of the correctional officers of other states, they are better situated than the inmate to see that the requirements of the law are met." (*Wilson, supra,* 69 Cal.App.3d at p. 637, fn. 1.) The court in *Wilson* did not specify any authority to force compliance or otherwise state to what lengths the district attorney must go in order to secure compliance, but we are satisfied that the DA met his obligation. Despite petitioner's allegations that the DA was noncompliant with the IAD, this court finds that the DA acted reasonably, as did the trial court,[4] with regard to requesting petitioner's transport to California. On March 14, 2005, the DA requested that petitioner be transported as soon as possible. This request was specifically denied by the Oregon Department of Corrections with assurances that the IAD countdown would be tolled because the prisoner was not free for transport and, therefore, "unable to stand trial." It was expressly stated that the Oregon Department of Corrections made an administrative decision that prevented the prisoner's transport until July 28, 2005. Petitioner's repeated acts of violence forced the Two Rivers facility to discipline him. The DA was not aware of the e-mail claiming "DOC could release him but they really do

---

[4] The trial court found petitioner caused the delay by his own "actions and his disciplinary problems." It further found that Oregon did not act unilaterally nor was it dilatory. The court summarized its thinking: ". . . I don't think [it is] reasonable[] that the defendant can send his request and then cause a delay for the release of the defendant and then request a dismissal on the receiving state because he wasn't delivered."

not like too [*sic*]" since it was sent internally between Oregon personnel. The DA had neither reason to doubt Oregon's assurances nor the authority to question its administrative decisions, and the IAD contains no express provision for its enforcement.

There was no failure of compliance by either party. Oregon officials had a reasonable administrative reason to delay compliance. They had promised California custody of petitioner after July 28, 2005, and he was delivered to San Bernardino County on August 15, 2005. A delay of just over two weeks to transport appears reasonable.

In reaching our conclusion, we emphasize the policy rationale of exempting an administrative delay caused by a prisoner's own bad conduct from inclusion in the IAD's 180-day time period. To hold otherwise would allow prisoners who have properly filed a section 1389 request for immediate disposition to thereafter engage in disruptive and violent behavior with impunity. An inmate could disobey or assault guards and fellow prisoners with confidence he would not face administrative discipline to correct his behavior. Allowing prisoners to avoid corrective disciplinary action or, worse yet, instilling incentives to commit serious misconduct, is not a policy this court wishes to promote.

■ We acknowledge that a fine balance must be struck between a prison's administrative discretionary decisions and a prisoner's right to be protected against violations of the IAD that may result from an arbitrary, vindictive, or merely negligent abuse of that discretion. To that end, this court adopts a standard that requires the trial court in the receiving state to consider the reasonableness of a delay in light of the actions of both the prison officials and the prisoner and any unreasonable delays in requesting rendition by the district attorney in the receiving state. (*Wilson, supra*, 69 Cal.App.3d at p. 637, fn. 2 [the district attorney took no action on the prisoner's demand for trial until five months after receiving it].)

Petitioner engaged in behavior he knew or should have known would result in prison officials taking corrective action, thus causing a trial delay in San Bernardino County. Petitioner was "unable to stand trial" due to his own conduct, "as determined by the court having jurisdiction of the matter." (§ 1389, art. VI, subd. (a).) Neither Oregon's nor California's actions were unreasonable, and they should not be penalized for the delay petitioner caused. The 180-day time period was tolled from February 3, 2005, the date the 180-day period would have begun, until July 28, 2005, the day his term in disciplinary segregation ended.

## DISPOSITION

The petition for writ of mandate is denied.

Ramirez, P. J., and Hollenhorst, J., concurred.

Petitioner's petition for review by the Supreme Court was denied May 14, 2008, S162281.