**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| JUAN VALENZUELA, | No.  19-55759 |
| Petitioner-Appellant, | D.C. No. 2:10-cv-02428-DSF-DFM |
| v. | |
| L. SMALL, | MEMORANDUM[*] |
| Respondent-Appellee. | |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted October 16, 2020
Pasadena, California

Before: MURGUIA and LEE, Circuit Judges, and KORMAN,[**] District Judge.

On August 1, 1995, Edward Wilkins died after he was shot several times while riding in a car. On August 23, Pops LeGrone was severely beaten in the parking lot of a liquor store in Long Beach, California. Soon after, Oscar Thomas was also assaulted near the same parking lot. Thomas survived, but LeGrone later died from

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]     The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

his injuries.

Petitioner Juan Valenzuela was ultimately charged with various offenses arising out of these crimes. At petitioner's trial, the district attorney called two eye-witnesses, one to each murder. Angela Liner testified that on August 1, 1995 she saw petitioner firing a gun at three African American men in a Cadillac. She had been drinking and had taken seizure medication that night. Liner did not come forward to authorities until her son was arrested in connection with the same crime. Liner testified that she remained at the scene while police were investigating the shooting, but she was not interviewed by officers and no other witnesses testified to her presence during that period. She testified that she had bought two beers, one at approximately 8 P.M. and one just before the liquor store closed, but a liquor store employee testified that Liner only purchased one beer at 8 P.M. and did not return.

Kevin Moran testified that on August 23, 1995 petitioner and a group of Hispanic men approached him and LeGrone and beat them both with fists and a baseball bat. Moran had a prior felony conviction and then-pending burglary charges for which he was offered a very favorable disposition. Nevertheless, Moran made prior consistent statements to officers at the scene shortly after the beating, undermining this potential ground for impeachment, and the prosecutor expressly relied on those statements in his summation.

Long Beach Police Department ("LBPD") Officer Julio Alcaraz was not an

eyewitness to either murder. Alcaraz testified that on August 1, he saw petitioner "hanging out" at a known gang spot near the liquor store approximately 35 minutes before Wilkins was killed. Alcaraz also testified that three weeks later, on August 23, approximately 30 minutes before LeGrone was assaulted, he saw petitioner walking in the direction of the scene of LeGrone's beating with Tapia, who was carrying a "wooden stick" of some kind. Shortly after Alcaraz saw petitioner, he responded to a call about Thomas being assaulted near the same place where LeGrone had been beaten. Paramedics had already removed LeGrone from the scene by the time Alcaraz arrived to find petitioner and Tapia fighting Thomas. Both were arrested there by Alcaraz and another officer.

Petitioner, who was convicted of the two murders and the assault, sought habeas relief in the California state courts, contending that the prosecution had improperly withheld information about Alcaraz's criminal conduct that could have been used to impeach Alcaraz at trial. Specifically, in 2000, some two and a half years after petitioner was convicted, petitioner learned that at the end of March 1997, a Deputy Chief of the LBPD contacted the FBI after receiving "credible evidence implicating [Officer Alcaraz]" in drug trafficking. Alcaraz was eventually indicted, but not until February 2000 for crimes committed between 1999 and 2000. And there was no evidence that he committed any offenses prior to 1998.

The California Court of Appeal held that petitioner failed to make the requisite

showing of prejudice under *Brady v. Maryland*, 373 U.S. 83 (1963) and denied the petition. Petitioner applied for relief pursuant to 28 U.S.C. § 2254. The district court held that it was not objectively unreasonable for the California Court of Appeal to find that petitioner was not prejudiced. On this appeal, petitioner concedes that we owe the California Court of Appeal's decision deference, *Amado v. Gonzalez*, 758 F.3d 1119, 1131 (9th Cir. 2014), unless he can show that it was "objectively unreasonable," *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). We hold that it was not.

For prejudice to have ensued under *Brady*, the withheld evidence must be material to the defendant's guilt or punishment. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016); *Smith v. Cain*, 565 U.S. 73, 75 (2012). Evidence is material if there is a "reasonable probability" that the result of the proceeding would have been different had the evidence been disclosed. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Alcaraz was not an eyewitness to either murder. With respect to Wilkins, the only support Alcaraz's testimony offered Liner's account was to place petitioner near the crime scene—at a place he was known to spend time—approximately 35 minutes before the shooting.[1] The same is true with respect to LaGrone. Moran provided the eyewitness account of LeGrone's murder. Alcaraz testified that on

---

[1] The prosecutor's closing argument never mentioned Alcaraz's testimony in connection with Wilkins's murder.

4

August 23 he saw petitioner and Tapia walking towards the liquor store about 30 minutes before LeGrone was beaten in the parking lot and that Tapia was carrying a stick of some kind. The same day, Alcaraz reported that account to LBPD Officer Chris Rose, and Rose's written report of the conversation, which he authenticated, was read into the record. Even setting aside that corroboration, we are not convinced that the prosecutor placed such emphasis on Alcaraz's testimony that the possibility of impeachment gave rise to prejudice. To the extent the prosecutor portrayed Alcaraz's testimony as "important," it is not clear that he was referring to the LeGrone murder as opposed, in some incoherent way, to the assault on Thomas.

Nevertheless, whatever words the prosecutor used, the issue turns on whether the alleged impeachment evidence was sufficient to create a reasonable probability of a different result. We hold that it was not, for two separate reasons. First, the fact that Alcaraz saw petitioner shortly before the assault on LeGrone (and his observation that Tapia was carrying some sort of stick) was corroborated by a recorded statement that Alcaraz made the same day, two and a half years before trial and the contemporaneous statements of Moran, enhances the credibility of Alcaraz's testimony. Second, and more significantly, the evidence that Alcaraz was involved in, though not yet convicted of, an unrelated offense was at best weakly probative of his credibility.

Indeed, the Federal Rules of Evidence would not permit such a use of such

5

uncharged conduct because it is not "probative of the character for truthfulness or untruthfulness of the witness." Fed. R. Evid. 608(b)(1); *United States v. Collins*, 90 F.3d 1420, 1429 (9th Cir. 1996); *cf. United States v. Gross*, 603 F.2d 757, 758 (9th Cir. 1979) ("[P]rior *convictions* for narcotics offenses are not technically within the concept of [c]rimen falsi, and . . . were inadmissible unless the Government bore its burden of proving that the probative value of the prior convictions for impeachment purposes exceeded the prejudicial effect of their admission.") (emphasis added). While California grants trial courts the discretion to allow the use of any uncharged conduct involving moral turpitude for impeachment, including drug trafficking, *People v. Harris*, 118 P.3d 545, 565 (Cal. 2005), the California Supreme Court has recognized that one of a number of considerations that a judge should take into account is that uncharged conduct is "generally [] less probative of immoral character or dishonesty" than a past conviction. *People v. Clark*, 261 P.3d 243, 307 (Cal. 2011). Moreover, "the latitude [the California Evidence Code] allows for exclusion of impeachment evidence . . . is broad" and "a reviewing court ordinarily will uphold the trial court's exercise of discretion." *Id.* Alcaraz's conduct was not only uncharged, it was also collateral. Thus, even if this information had been disclosed, it is at best uncertain that the trial judge would have allowed its use for impeachment. If it could not have been so used, it could not have affected the verdict. *See Kyles*, 514 U.S. at 435 (explaining that a *Brady* violation requires, a

6

"showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

In sum, it was objectively reasonable for the Court of Appeal to conclude that the availability of evidence to impeach Alcaraz would not have given rise to a reasonable probability of a different result.

**AFFIRMED.**